UNITED STATES of America, Plaintiff,

v.

William L. "Corky" ELLIS et al., Defendants.

No. 78–30269–NA–CR.

United States District Court,
M. D. Tennessee,
Nashville Division.

March 28, 1979.

Richard L. Windsor, Asst. U. S. Atty., Nashville, Tenn., for plaintiff.

Cecil D. Branstetter, Nashville, Tenn., for defendants.

## MEMORANDA OPINIONS AND ORDERS

NEESE, District Judge.*

The jury found the defendant Mr. William L. ("Corky") Ellis guilty as charged in counts one through six, inclusive, and fourteen through eighteen, inclusive, of the indictment herein. After the discharge of the jury, Mr. Ellis elected timely to renew his earlier motion for entry of a judgment of acquittal[1] as to each of those 11 counts. Rule 29(c), Federal Rules of Civil Procedure.

■■■■ In deciding such motion, the crucial consideration is whether the evidence as to each such count was sufficient to sustain a conviction under that count; in other words: whether there was relevant evidence from which the jury could have found or inferred properly beyond a reasonable doubt that the defendant is guilty as charged. *American Tobacco Co. v. United States* (1946), 328 U.S. 781, 787 n. 4, 66 S.Ct. 1125, 1128 n. 4, 90 L.Ed. 1575, 1582 n. 4. The late Judge Prettyman expressed the guiding rule this way:

\* \* \* \* \* \*

The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence under which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

\* \* \* \* \* \*

*Curley v. United States*, C.A.D.C. (1947), 160 F.2d 229, 232–233, certiorari denied (1947), 331 U.S. 837, 67 S.Ct. 1511, 1512, 91 L.Ed. 1850; *accord: United States v. Gaines*, C.A.6th (1965), 353 F.2d 276, 278[8].

---

\* Of the Eastern District of Tennessee sitting by designation and assignment.

1. It is not incumbent upon this Court to ascertain whether Mr. Ellis' election along this line will preclude his relying on the grounds of his renewed motion for entry of a judgment of acquittal on any appeal herein. *See* Rule 4(b), Federal Rules of Appellate Procedure. With such a possibility in prospect, however, in fairness to Mr. Ellis, the Court accorded that motion and those grounds extensive and intensive consideration against the possibility that he may not be able to "take another bite out of the same apple" before an appellate court.

■ The evidence at this juncture in the proceedings is to be viewed in the light most favorable to the prosecution. *Glasser v. United States* (1942), 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (headnote 17); *United States v. Collon*, C.A.6th (1970), 426 F.2d 939, 942[2]. In that light, the Court views the evidence as follows:

Historically, presidents of the local labor organization of Teamsters at Nashville, Tennessee (union) seem to have managed its treasury as if it were their private preserve. As an example, while serving in this capacity, Mr. Don Vestal operated to his own private gain, with no ostensible benefit to the union, a newspaper in which business concerns and individuals who desired the good-will of the union purchased advertising (of dubious value to them). That publication was printed upon presses located in the basement area of the union headquarters. Eventually, Mr. Vestal was removed from his office by judicial fiat, and the union was operated under a trusteeship of its parent, international-union.

Mr. Ellis was the first member-elected president of the union after the termination of that trusteeship. Along the way, those printing presses were moved from the union's headquarters-building, and there has not been since an equally blatant perversion of the union's prestige for private gain.

To fill this void and for private fiscal enhancement, Mr. Ellis entered into a two-pronged conspiracy to profit personally from publications, established by others, seeking to reap the harvest of the then-untapped available advertising revenues. On behalf of the union, he entered into a contractual arrangement with D. & P. Associates, Inc. (D. & P.), represented by a Mr. Pomporini, whereby D. & P. would publish 3 annual editions of the *Tennessee Teamster's Yearbook (Yearbook)*, and the union would be paid a minimum of $1,000 a year from the proceeds.

Belatedly, the union "accepted" this project, but none of the cash consideration it was to be paid therefrom ever reached its treasury; Mr. Pomporini paid a sum of money to Mr. Ellis (which Mr. Ellis testified was in repayment of a personal loan and constituted in no part union funds). In any event, no money received from Mr. Pomporini or D. & P. was placed in the union's treasury by Mr. Ellis.

Mr. Ellis also entered into an agreement with Mr. Cecil Stamps, a convict at time of trial, for the publication of the *Tennessee Labor News (News)*; the union at no time acquired any property or other interest in this newspaper, but Mr. Stamps made cash payments to Mr. Ellis for the latter's tolerance of this project. But 2 editions of this publication were issued, after which Messrs. Stamps and Ellis decided to allow advertisers therein " * * * to rest a little while. * * * " At the conclusion of this rest-period, publication was resumed, this time under the name, *The Tennessee Labor Journal (Journal)*.

Mr. Ellis' codefendant Mr. Nelson T. Lewellen, not on trial jointly with him, was a coconspirator with Messrs. Ellis, Pomporini and Stamps. He acquired in the Nashville, Tennessee Post Office rental post office box no. 8162 in the name of the *Journal* and utilized the mail extensively in connection with the business of that publication.

Throughout, it was a part of the scheme agreed upon by the conspirators to keep the operation of these publications as far removed in the public view from Mr. Ellis as possible, and to conceal from advertisers whether these publications were, or were not, projects which benefited the union and its general membership. As many of the advertisers were in places far removed from Nashville, it was an essential part of the conspirators' plot that the mail be used by advertisers to pay the *Journal* for the advertisements which had been purchased. 5 or more of these respective advertisers were caused by Mr. Ellis, through one or another of his coconspirators, to utilize the mail in the execution of their scheme.

The interest the union acquired by contract in the publication of the *Yearbook* was a property-interest, and Mr. Ellis converted that interest to his own use or the use of some other person.

The foregoing is believed to be a fair statement of the essential facts of this lawsuit as they relate to all counts of the indictment, under which Mr. Ellis was convicted, with the exception of the latter (numerically) 4 counts thereof. As to those latter counts, the salient facts under the view most favorable to the prosecution are:

The union furnished Mr. Ellis with an automobile; he was authorized to use this vehicle for his personal and private business as well as for union business. Mr. Ellis' telephone tolls on union business were authorized also by the union; but, he was not authorized to charge tolls which related to his personal and private business to the union's telephones. Mr. Ellis was authorized (implicitly or expressly) also to use a credit-card to charge to the union's telephones long distance tolls on union business for calls which he made on telephones other than the union's telephones; he was not authorized by the union to authorize anyone else to charge telephone tolls to its telephones unless for the benefit of the union.

Mr. Ellis made personal long distance telephone calls at union expense to order veterinary supplies for his horses. He engaged on his private business 2 different persons to train and otherwise attend to his personal racehorses, including racing them in Louisiana and Florida. One of these trainers, Mr. John Thomas Hickman, used the automobile, assigned to Mr. Ellis' unrestricted use, to transport one of Mr. Ellis' racehorses. Mr. Ellis gave Mr. Hickman the number of the union's telephone credit-card and instructed him to utilize it as necessary in connection with that transportation. Mr. Hickman charged one such call on that card for such reason; however, thereafter, Mr. Hickman also charged his personal calls placed to his own relatives on that card.

The other trainer, Mr. George Akin, was also given such number by Mr. Ellis, to use in contacting by telephone unemployed members of the union, with whose whereabouts Mr. Akin was more familiar than Mr. Ellis, and conveying to them information relating to job-openings to be filled on the referral of the union. Mr. Akin went farther and allowed his nephew to charge on the card telephone tolls for calls he made from Louisiana and Florida to his girl-friend back in Tennessee. In an 11-month period, Mr. Akin was responsible in this manner for the charging of tolls to the union's telephones in the aggregate amount of some $1,000.

Mr. Ellis, as president of the union, was an essential signatory on annual reports of the union under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401, et seq. His salary and other compensation from the union exceeded $10,000 annually. He was required to disclose, or cause the union to disclose, all material facts concerning his salary, allowances, and other direct and indirect disbursements to himself as such officer. 29 U.S.C. § 431(b)(3). In reports for the respective years, 1974–1976, inclusive, Mr. Ellis failed to disclose, or cause to be disclosed by the union, the compensation he received represented by the value of the aforementioned telephone calls. This misrepresentation or failure to disclose a material fact, knowing the representation to be false, was done knowingly by Mr. Ellis. *See* 29 U.S.C. § 439(b).

■ The immediately foregoing is believed to be a fair statement of the facts of this lawsuit as they relate to the final 4 counts of the indictment. From the foregoing (in its entirety), it will be seen readily that the evidence was sufficient to sustain Mr. Ellis' conviction under count fourteen. The jury could have deducted inferentially that the money Mr. Pomporini paid Mr. Ellis belonged to the union as a property-right under its contract with D. & P., and that Mr. Ellis, with intent to defraud, converted that money or property of the union to his own use or the use of someone else.

The evidence was sufficient to sustain Mr. Ellis' conviction under count fifteen also, unless the jury accredited Messrs. Ellis, Hickman and Akin perfectly as witnesses and gave full weight to their testimony exculpating Mr. Ellis. By its verdict on this count, the jury appears on this point to have discredited those witnesses or given their exculpatory testimony little or no weight. The jury could have inferred reasonably that Mr. Ellis extended Messrs. Akin and Hickman *carte blanche* to use the union's telephone credit-card any way each of them chose.

■ Despite the fact that there was no direct evidence probative of the fact that Mr. Ellis allowed Messrs. Akin and Hickman and any person(s) they might designate to use this card at-will, this was a finding, nevertheless, the jurors could have made by reasonable inference upon assessing the credibilities and weights of the witnesses and the pertinent testimony. In a criminal action such as this, the jury " * * * has the power to bring in a verdict in the teeth of both law and facts. * * * " *Horning v. District of Columbia* (1920), 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185, 186–187. " * * * [J]uries are not bound by what seems inescapable logic to judges. * * * " *Morissette v. United States* (1952), 342 U.S. 246, 276, 72 S.Ct. 240, 256, 96 L.Ed. 288, 307.

Mr. Ellis would have this Court apply the *de minimis* rule, which is applied in some criminal prosecutions, and set-aside the verdicts of the jury as to counts fifteen through eighteen, inclusive, because the amounts of the telephone calls involved are comparatively small, when all the annual disbursements of the union are taken into account. The Court cannot do this appropriately.

■ The Congress fashioned an entirely new crime in the enactment of 29 U.S.C. § 501(c), the scope of which is far more extensive than that applied to acts of a somewhat similar nature which had been made federal crimes earlier. *United States v. Nell,* C.A. 5th (1976), 526 F.2d 1223, 1232[15]. The Labor-Management Report-

ing and Disclosure Act, *supra,* of which it is a part, was based upon congressional findings that:

*   *   *   *   *   *

The members of a labor organization are the real owners of the money and property of such organizations and are entitled to a full accounting of *all* transactions involving such money and property. Because union funds belong to the members they should be expended *only* in furtherance of their common interest. A union treasury should not be managed as though it were the private property of the union officers, however well-intentioned such officers might be, but as a fund governed by fiduciary standards. [Emphases added.]

*   *   *   *   *   *

House Report no. 741 of the Committee on Education and Labor. So, all of the funds of a labor organization must be treated as trust funds belonging to the union's members. *United States v. Goad,* C.A. 8th (1974), 490 F.2d 1158, 1162[2], certiorari denied (1974), 417 U.S. 975, 94 S.Ct. 3068, 41 L.Ed.2d 665. If any of those funds have been unlawfully converted or not properly reported, crimes have been committed.

■ Mr. Ellis claims that evidence is lacking to support his conviction under (the conspiracy) count one of the indictment, in that it was not proved that the conspirators contemplated the use of the mails in furtherance of their fraudulent scheme relating to the publication of the *Journal.* This contention likewise has no merit.

Once the jury found that a conspiracy to defraud advertisers in the publication under consideration had been devised, and letters had been mailed in the execution of that scheme, it was not necessary for the jury to have found in addition " * * * that the scheme contemplate[d] the use of the mails as an essential element * * * " of the crime, so long as the jury found that the mailing " * * * incident to an essential part of the scheme. * * * " *Pereira v. United States* (1954), 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435, 444 (headnote 9);

accord: *United States v. Maze* (1974), 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603, 608[5], and *United States v. Street*, C.A. 6th (1976), 529 F.2d 226, 228–229[1].

Mr. Ellis takes the position that, if there were any conspiracies herein, they were separate as regards the *Journal*, on the one hand, and the *News*, on the other. He assumed in his brief that the Court had " * * * already recognized * * * " this separateness.

The distinction the Court had in mind related to the *Yearbook*, on the one hand, and the *Journal*, on the other. There was allusion to this in the Court's memorandum opinion and order herein of February 16, 1979, in which the Court withdrew from the further consideration of the jury counts seven through thirteen, inclusive, of the indictment.

As the Court understood the evidence at that time, the bilking of the advertisers in the *Yearbook* was predicated by the prosecution on the statement, it claimed to have been false, fraudulent, and misleading, that the *Yearbook* was authorized and sponsored by the union. It was undisputed in the evidence that the *Yearbook* project was indeed accepted by the union; so, such statement was neither false, fraudulent, or misleading.

Regarding count thirteen, it was demonstrated affirmatively that the union at no time had as an asset any money, ownership or property-interest in the *Journal*. This being true, Mr. Ellis could not have knowingly converted to his own use or the use of someone else " * * * money, property or other assets * * * " *of* the union in relation to the *Journal*, as opposed to the *Yearbook*.

The evidence was sufficient also to sustain a conviction of Mr. Ellis as an aider-and-abettor of Messrs. Stamps and Lewellen, or one of them respectively, in causing the various checks to be mailed to the post office box of the *Journal* in payment of advertising therein, as charged in counts two through six, inclusive, of the indictment. Reiterating to some extent, there was evidence of a conspiratorial scheme by Messrs. Ellis, Lewellen, Stamps and others to bilk advertisers fraudulently and obtain money in this way from them upon known false representations, as charged in each of the counts now under consideration; that Messrs. Lewellen or Stamps, or one of them respectively in each instance, knowingly caused mail-delivery of a check in payment of such advertising; that the causing of the mails to be used in this manner was done by them wilfully and with the specific intent by Mr. Ellis to carry-through the scheme he had participated in devising; and that, although he did not do any of these acts physically himself, he aided-and-abetted his coconspirators in so doing and/or caused wilfully these acts to be done by them.

There was no reasonable doubt that Mr. Ellis associated himself in these substantive acts of mail-fraud by his cohorts; that he participated in the transactions as something he wished to bring about; and that he sought by his own action to make their scheme succeed; accordingly, he is as guilty as his cohorts, *Nye & Nissen v. United States* (1949), 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (headnote 4), because he shared consciously their criminal venture, *Pereira v. United States, supra,* 347 U.S. at 11, 74 S.Ct. at 364, 98 L.Ed. at 446 (headnote 17). As to each of these counts now under consideration, it was not a prerequisite to a conviction of Mr. Ellis that the cohort actually committing physically the unlawful act charged have been identified. *Ambrose v. United States,* D.C.Tenn. (1974), 384 F.Supp. 681, 682, affirmed C.A. 6th (1974), 508 F.2d 843 (table).

█ Mr. Ellis laid as additional grounds for his motion for a posttrial entry of a judgment of acquittal, as to the foregoing 11 counts, alleged errata in the Court's instructions to the jury. Of course, these could not be, and are not, a cognizable ground for such a motion.

Because of the nature of the evidence as a whole, and the disparity of inferences which could have been drawn therefrom reasonably, especially with reference to any criminal intent of Mr. Ellis, or lack of it, in

each instance, this Court is forced to the conclusion that the evidence was such that any reasonable mind might have had fairly a reasonable doubt as to Mr. Ellis' guilt *or* might not have had such a doubt in that respect. "*  *  * Where [the] intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. * * * " *Morissette v. United States, supra*, 342 U.S. at 274, 72 S.Ct. at 255, 96 L.Ed. at 306 (headnote 15); *accord: United States v. Bryant*, C.A. 6th (1972), 461 F.2d 912, 920[12], and *United States v. Luxenberg*, C.A. 6th (1967), 374 F.2d 241, 249[16]. Accordingly, his posttrial motion for entry of a judgment of acquittal as to each of the 11 remaining counts of the indictment must be, and hereby is,

OVERRULED, *cf. United States v. Sutton*, C.A.D.C. (1969), 426 F.2d 1202, 1210[11].

■ Mr. Ellis moved timely also for a new trial, Rule 33, Federal Rules of Criminal Procedure, asserting several alleged errors which had occurred during the trial as grounds therefor. The Court has discretion to determine whether, in the interest of justice, a new trial should be granted. *Petro v. United States*, C.A. 6th (1954), 210 F.2d 49, 53[10], certiorari denied *sub nom. Sanzo v. United States*, (1954), 347 U.S. 974, 978, 74 S.Ct. 785, 790, 98 L.Ed. 1114, 1116. (The Court addresses those grounds only to the extent they had not been addressed earlier herein.)

It is claimed that the Court erred in sending to the jury-room the exhibits which had been admitted in evidence over the objection of Mr. Ellis. His objection extended to all exhibits.

■ It has long been the practice of the undersigned judge not to send any exhibits to the jury-room unless they are called-for by a deliberating jury, on the theory that documentary evidence should not be emphasized ordinarily above testimonial evidence; and, if any exhibit is sent-in, all are sent-in, to avoid unusually emphasizing any particular piece of the documentary evidence. The Court devoted 5 days to the reception of

evidence herein; there were a multiplicity of exhibits admitted into evidence; the jury was asked to return verdicts as to 11 separate crimes, many of which implicated documentary evidence. There was no abuse of the Court's discretion in honoring under the circumstances the jury's request for all the exhibits. *Cf. United States v. Foster*, C.A. 6th (1969), 407 F.2d 1335, 1336[3], certiorari denied (1969), 396 U.S. 862, 90 S.Ct. 134, 24 L.Ed.2d 114.

Although exhibits admitted on the issues implicated in the counts which were afterward withdrawn from the jury's consideration were included in the delivery, these exhibits continued to have a relevance on its determination of Mr. Ellis' state-of-mind at the pertinent times. *United States v. Curtis*, C.A. 10th (1976), 537 F.2d 1091, 1097[13], [14], certiorari denied (1976), 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330. No error was committed in this matter. *Cf. Neely v. United States*, C.A. 9th (1962), 300 F.2d 67, 75[11], certiorari denied (1962), 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84.

Mr. Ellis also contends that he was prejudiced on the latter counts under which he was convicted by evidence relating to the earlier counts (and apparently *vice versa*). He argues that if the jury had considered separately each count, and only the evidence relating to that particular count, he would not have been convicted. In this connection, the Court instructed the jury as follows:

\*   \*   \*   \*   \*   \*

A separate crime or offense is charged in each of the remaining 11 counts of this indictment. Each offense and the evidence applicable thereto should be considered separately.

The fact that you may find Mr. Ellis guilty, or not guilty, of the offense charged in any one count, should not control your verdict with respect to the offenses charged in the other counts.

\*   \*   \*   \*   \*   \*

■ The jury must be presumed to have been capable of sorting-out the evidence and considering each count separately. See

*United States v. Frazier*, C.A. 6th (1978), 584 F.2d 790, 795[10]. This Court is not aware of any specific instance wherein the jury might have been confused by the scope of the proof or was unable to limit the evidence to a single count where so required. See *United States v. Grunsfeld*, C.A. 6th (1977), 558 F.2d 1231, 1237, certiorari denied (1977), 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152. In light of the foregoing instructions, it must be assumed that evidence relating to any one count did not taint the verdict of the jury as to any other count. *United States v. Parker*, C.A. 9th (1970), 432 F.2d 1251, 1255[3].

The Court is not persuaded by Mr. Ellis' claim of selective prosecution. Some degree of selectivity is inherent in every prosecution, and there is not in this record the slightest intimation that the government's decision to prosecute Mr. Ellis herein was based upon impermissible standards or that such decision was made in bad faith. See *United States v. Cooper*, C.A. 6th (1978), 577 F.2d 1079, 1086[7].

A disturbing ground of Mr. Ellis' motion for a new trial is that the prosecuting attorney was guilty of prejudicial misconduct in undertaking to impeach his character inferentially, by proof that Mr. Pomporini had been convicted during his lifetime of mail-fraud. Mr. Pomporini was deceased at the time of this trial. Both the prosecuting attorney and defense counsel had developed earlier through witnesses a great deal that Mr. Pomporini was reported to have done and, without objection, said. There had been no previous attack by either party by opinion or reputation evidence or otherwise on the character of Mr. Pomporini for truthfulness. Nonetheless, the prosecuting attorney asked a witness in rebuttal concerning an earlier conviction of Mr. Pomporini for the felony of mail-fraud.

Rule 404(b), Federal Rules of Evidence, states very plainly that " * * * [e]vidence of other crimes * * * is not admissible to prove the character of a person in order to show that he acted in conformity therewith. * * * * " Sub-§ (a) of the same rule reiterates that " * * * [e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except: * * * " as related to (1) the accused, (2) the victim of the crime, or (3) a witness " * * * as provided in rules 607, 608, and 609."

As Mr. Pomporini was none of these 3 excepted persons, in so far as this case is concerned, the purpose of the prosecuting attorney must be said to have been to show that Mr. Pomporini acted in conformity with his character as a mail-fraud convict in dealing with Mr. Ellis, and thereby to suggest that the jury infer that Mr. Ellis' conduct was also of a mail-fraud nature.

If such was the purpose of the prosecuting attorney, such evidence was irrelevant and barred: proof of the conduct of a third person is prohibited where the evidence is offered to prove his or her character as a basis for an inference as to his or her conduct; and the conduct of a third person offered to prove the character of the accused is barred as evidence of the defendant's conduct. 22 Wright & Graham, Federal Practice and Procedure, 457–458, Evidence, § 5239. " * * * An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence. * * * " *Bruton v. United States* (1968), 391 U.S. 123, 131, 88 S.Ct. 1620, 1625, n. 6, 20 L.Ed.2d 476, 482[5], n. 6. Testing the credibility of a person by showing a previous conviction of a felony is proper only when the credibility of that person has been put in issue. *United States v. Benson*, C.A. 6th (1966), 369 F.2d 569, 572[6].

It is appropriate to repeat here the recent observation of Circuit Judge Keith, of our Court of Appeals, with regard to the great responsibility an attorney for the government bears in prosecuting a person for crime:

\* \* \* \* \* \*

* * * Once again we quote the "oft-repeated and sometimes ignored" [footnote reference omitted] words of the Supreme Court in *Berger v. United States*,

295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

More to the point of the facts of this case are the words of Mr. Justice Douglas:

> The function of the prosecutor under the Federal Constitution is not to tack as may skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 648–649, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1974) (Douglas, J. dissenting).

*United States v. Bess*, C.A. 6th (1979), 593 F.2d 749, 753; *accord*: *United States v. Steinkoetter*, C.A. 6th (1979), 593 F.2d 747, 748.

Immediately when this improper method of the prosecuting attorney surfaced, the Court took him to task, rebuked him pointedly and sternly in the presence of the jury, and explained to the jury that it would constitute a violation of their own oaths, to decide the guilt or innocence of Mr. Ellis according to law, unless this inappropriate question were disregarded by them. In addition to the instantaneous instructions given the jury upon overruling Mr. Ellis' mo-

tion for a mistrial, the Court repeated in the principal instructions afterward:

> \* \* \* \* \* \*
>
> \* \* \* [Y]ou must consider nothing but legal evidence presented before you in support of the charges against Mr. Ellis.
>
> \* \* \* \* \* \*
>
> \* \* \* [A]ny conviction of Mr. Ellis must be based only on evidence.
>
> \* \* \* \* \* \*
>
> Any evidence \* \* \* you were instructed by the Court to disregard must be entirely disregarded \* \* \*. You are to consider only the evidence in this particular lawsuit.
>
> \* \* \* \* \* \*
>
> When the Court sustained an objection to a question addressed to a witness, you must disregard that question; you must draw no inference from the wording of the question; and you must not speculate as to what the witness might have said if he had been permitted to answer.
>
> \* \* \* \* \* \*
>
> Remember also, please, that Mr. Ellis is not on trial for any act or conduct not alleged in the remaining counts of this indictment. \* \* \* You are not called on to return a verdict as to the guilt or innocence of any other person or persons.
>
> \* \* \* \* \* \*

■ " \* \* \* It is the general rule that cautionary instructions to a jury to disregard \* \* \* improper and prejudicial questions \* \* \* are deemed to cure such errors. \* \* \* " *United States v. Haskins*, C.A. 6th (1965), 345 F.2d 111, 115[9]. It is believed that the limiting instructions given were sufficient to protect Mr. Ellis' constitutional right to a fair trial. *Cf. Frazier v. Cupp* (1969), 394 U.S. 731, 735, 89 S.Ct. 1420, 1422, 22 L.Ed.2d 684, 691[2].

■ Next for consideration is whether Mr. Ellis was prejudiced beyond his constitutional right by this prosecutorial misconduct. In the exercise of its discretion in

passing upon the motion of Mr. Ellis for a new trial on this ground, the Court holds in mind the harmless-error provisions of Rule 52, Federal Rules of Criminal Procedure, and will not grant a new trial unless the substantial rights of Mr. Ellis were affected by the method employed. The gravity of the prosecuting attorney's act is an important element in deciding that. *Kyle v. United States*, C.A. 2d (1961), 297 F.2d 507, 514[5], certiorari denied (1964), 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179.

As the late Circuit Judge Friendly reasoned:

\* \* \* \* \* \*

\* \* \* [W]here the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of fact considering all admissible evidence that has become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome \* \* \*.

*Idem.* The method employed by the prosecuting attorney herein is a matter of the gravest concern to the Court; but, it is doubtful that another trial of 6 or more days would be perfect in all of its aspects, or that it would produce a different result.[2]

The Court is not cognizant of any other undesirable or pernicious element which might have infected the proceedings. With only one possible exception, *infra*, it is believed by the Court that the lengthy instructions to the jury were correct.

The convictions of Mr. Ellis fall somewhat naturally into two categories, each of them with one sub-category. The first category related to Mr. Ellis' dealings with Mr. Pomporini with reference to the *Yearbook* and with Messrs. Stamps and Lewellen with regard, first, to the *News*, and, afterward, the *Journal*, and the sub-category is the latter two persons' and Mr. Ellis' causing the mail to be used in implementation of their prearranged plan. The second category related to Mr. Ellis' conversion of union property or funds in connection with the *Yearbook* and in his utilization for private purposes of the union's long distance telephone service, with this sub-category pertaining to his failing to cause to be reported this additional compensation he had received as a result of the telephone use.

The proof of Mr. Ellis' guilt of the charges in these two categories was strongly supported by the evidence of his *acts*; the only really viable *questions* related to whether he had had the necessary criminal *intent*. As the evidence had shown theretofore that one of his coconspirators, Mr. Stamps, was a convict, this development of the fact that Mr. Pomporini was also a convict probably had little bearing on the jury's decision as to that intent.

Even though this Court is of the considered view that the method employed by the prosecuting attorney had only a minimal degree of potential prejudice to Mr. Ellis under the circumstances, this does not end proper inquiry. The practice of any attorney for the government, in offering prejudicial evidence which he or she should know is inadmissible, is condemned throughout this entire circuit; so that delving must go deeper.

The Court (without the benefit of the record before it) cannot now recall any other conduct on the part of the prosecuting attorney on a par with this misconduct; the trial was somewhat long, and this constituted but an isolated incident in it. The Court is not persuaded fully that the attorney for the government used this tactic with the deliberate motive to "nail" Mr. Ellis' "skin to the wall."

It is believed that the action, attitude and actual language of the Court, in seeking to overcome or, at least, dissipate, any prejudice caused Mr. Ellis, was effective in accomplishing that end. The verdicts the

---

**2.** " \* \* \* [I]nstances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' \* \* \* "

*Bruton v. United States, supra*, 391 U.S. at 135, 88 S.Ct. at 1627, 20 L.Ed.2d at 484, quoting from *Lutwak v. United States* (1953), 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 604.

jury returned after a surprisingly brief period of deliberation on 11 separate crimes reflects that its members had little difficulty in finding Mr. Ellis guilty as charged on the proof adduced on the trial. Under the aggregate of those circumstances, the error committed by the prosecuting attorney, while never to be condoned by this Court, may be said safely to have been harmless. *Cf. United States v. Leon*, C.A. 6th (1976), 534 F.2d 667, 679[13], citing *inter alia Donnelly v. DeChristoforo, supra*.

In the light of this survey, this Court is able to declare beyond a reasonable doubt its belief that this error of the prosecuting attorney affected no constitutional or other substantial right of Mr. Ellis and was harmless in the overall picture. Rule 52, *supra*. This Court has concluded, albeit uneasily, that there was not a reasonable possibility that the question asked contributed to Mr. Ellis' conviction. *Chapman v. California* (1967), 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705, 709, 711[5], [6, 7], rehearing denied (1967), 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241.

Mr. Ellis asserts error in the Court's instructing the jury that it had " * * * authority to judge the legitimacy of [u]nion expenditures, judgment which is vested solely in union officials except upon issues as to whether [certain] expenditures violate particular laws prohibiting them." This Court is in agreement with Mr. Ellis, to the extent that a labor organization may expend its funds and assets for any lawful purpose it may see fit; however, this Court does not agree that the exclusive judgment of the propriety of an expenditure of a labor organization is reposed " * * * solely in union officials. * * * "

The Labor-Management Reporting and Disclosure Act, *supra*, imposes a very broad fiduciary duty upon officers of a union to protect the general membership of the union from the corruption of their officers and others. 29 U.S.C. § 501(a). A union official must " * * * hold its money and property solely for the benefit of the organization and its members * * * , expend the same in accordance with its constitution and bylaws and any resolutions of [its] governing [body] adopted thereunder, * * * refrain from * * * holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and * * * account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. * * * " *Idem.*[3] It very well may be the prerogative of union officials to ascertain initially whether union funds are disbursed in accordance with a union's constitution, bylaws and resolutions adopted thereunder by its governing body; but, whatever that determination may be, it must be found to conform to the foregoing statutory mandate.

In charges of a violation of 29 U.S.C. § 501(c), the courts are in agreement with regard to the essential elements of the crime relating to disbursements which have been authorized by a union. *United States v. Bane*, C.A. 6th (1978), 583 F.2d 832, 835–836[2]. The essential elements of that crime are not yet delineated as clearly with relation to unauthorized disbursements. *Ibid.*, 583 F.2d at 835; but see and *cf. United States v. Goad*, C.A. 8th (1973), 490 F.2d 1158, 1166, certiorari denied (1974), 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665, *contra: United States v. Ottley*, C.A. 2d (1975), 509 F.2d 667, 671[2]. However, by way of dictum, our own Court of Appeals (with the author a member of the adjudicating panel) has approved the giving of an instruction to the jury in such a case, to the effect that a guilty verdict is warranted if funds authorized by a union were not expended within the limitation of the authorization given. *United States v. Bane, supra*, 583 F.2d at 835, n. 7.

In respect of the telephone calls and use of the union automobile, an issue was

---

**3.** Interestingly to the Court, the Congress in its wisdom did not make the breach of these fiduciary duties by the officer of a labor union a criminal offense; there must be a violation of 29 U.S.C. § 501(c) to implicate a criminal penalty under the Act, although a breach of those duties does give rise to a civil action under 29 U.S.C. § 501(b).

whether Mr. Ellis' authorization from the union was exceeded; in respect of the payment to the union by D. & P., an issue was whether Mr. Ellis had embezzled or converted to his use or the use of another person money belonging rightfully to the union.

■ It was made perfectly clear in *United States v. Goad, supra,* 490 F.2d at 1166, that, if an official of a union spends funds that have been authorized by the union by mistake or accident, " * * * he is not liable under § 501(c). * * * " It is clear, furthermore, that, if an official of a union expended union funds which were unauthorized in a good-faith belief that the union would grant authorization after-the-fact, he is not liable under § 501(c). *United States v. Santiago,* C.A. 2d (1976), 528 F.2d 1130, 1133–1134[4], certiorari denied (1976), 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795.

Mr. Ellis contended *inter alia* (1) that the money he received from Mr. Pomporini was in repayment of a personal loan and did not represent union-money; (2) that the union disbursement of funds to pay for a long distance telephone call, concerned with his surrogate operation of a union vehicle, was authorized; and (3) that its payment for other telephone calls made for him by Messrs. Akin and Hickman were either (a) authorized by the union or (b) in excess of the permission granted those persons by Mr. Ellis. He contended also that, equitably, he was entitled to a setoff against the foregoing tolls, by the amount he had paid personally for tolls on union business from his private telephone.

■ In this somewhat hybrid situation, implicating as it does both authorized and unauthorized calls, this Court may or may not have been correct in instructing the jury that it was an essential element of the § 501(c) crime for the jury to find that Mr. Ellis " * * * did not have a good-faith belief that the particular expenditure was for the legitimate benefit of the union." If incorrect, this worked in Mr. Ellis' favor, however; because, it required the prosecution to have proved an extra element of his guilt. *Cf. United States v. Bane, supra,* 583 F.2d at 835, n. 7.

■ There was no error in the Court's proceeding to entertain a certain tape recording made by an electronic device, which was represented to include thereon voices in a conversation, until it appeared that the prosecution was unable to establish the chain of the pretrial custody of the tape. " * * * [T]he most reliable evidence possible of a conversation * * * " is that provided by an electronic device. *Lopez v. United States* (1963), 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462, 470 (headnote 7). The proposed exhibit could not be received in evidence, because its chain of custody could not be established sufficiently to lay a foundation for its admission. *Cf. United States v. Robinson,* D.C.Tenn. (1977), 367 F.Supp. 1108, 1109–1110[2].

This Court is unadvised how it might have handled the prospect of this evidence differently or better.

■ The assertion of Mr. Ellis that the assistant United States attorney, prosecuting this action, may have gained the sympathy of the jurors " * * * as the victim of objections and admonishtions [sic: admonitions] * * * " lacks merit. This he contends, sprang from the repeated failure of such attorney to deliver material to defense counsel at the times required by the Court, resulting in repeated objections by defense counsel and, consequently, repeated admonishments from the Court.

The Court instructed the jury, *inter alia* :

\*　　\*　　\*　　\*　　\*　　\*

You are to perform your duty without bias or prejudice to anyone. The law does not permit you to be governed by sympathy * * *; rather, it is expected that you will consider carefully and impartially all the evidence, follow the law as stated to you at this time by the Court, and arrive at the verdict on each remaining count of the indictment which you think is just, fair and right under all the proof.

\*　　\*　　\*　　\*　　\*　　\*

* * * [Y]ou must consider nothing but legal evidence presented before you

in support of the charges against Mr. Ellis.

\* \* \* \* \* \*

Remember, it is the duty of lawyers to object \* \* \*.

\* \* \* \* \* \*

Remember always, please, that you are not partisans. You are not for or against the government; you are not for or against Mr. Ellis. You are judges, judges of the facts. Your sole interest is to ascertain the truth of this matter from the evidence presented before you.

\* \* \* \* \* \*

\* \* \* [K]eep constantly in mind that it would be a violation of your sworn duty to base your verdicts on anything but the evidence and the law in this particular case.

It isn't ever a question of whether our government wins or loses a case; because, our government always wins when justice is done,—regardless of whether the verdict of the jury is guilty or not guilty.

\* \* \* \* \* \*

Nothing occurring during the trial, even so trivial a thing as a facial expression or a voice inflection, or anything else which occurred, is to suggest to you any intimation of what the Court thinks your verdicts should be.

\* \* \* \* \* \*

Absent anything to rebut it (save the conclusion of Mr. Ellis), " \* \* \* it must be presumed that the jury conscientiously observed \* \* \* " these instructions of the Court. *Shotwell Mfg. Co. v. United States* (1963), 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357, 375 (headnote 22).

Thus, there was no plain error, and if this Court committed any error in the trial of Mr. Ellis, it did not affect his substantial right and is to be disregarded, Rule 52, *supra*. For such reason the interest of justice does not require that a new trial be granted. Rule 33, *supra*. His motion for a new trial, therefore, hereby is

DENIED.